**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

```
_____
                              )
JOHN & JANE, LLC,             )
                              )
               Plaintiff,     )
                              )
v.                            )         Civil Action
                              )         No. 24-cv-11508-PBS
RUSSELL ISABEL,               )
                              )
               Defendant.     )
_____)
```

**MEMORANDUM AND ORDER**

February 9, 2026

Saris, J.

**INTRODUCTION**

In August 2022, Defendant Russell Isabel served as the master aboard the F/V JANE ELIZABETH ("the Vessel"), a vessel owned by Plaintiff John & Jane, LLC ("J&J"), on a scallop-fishing voyage. During the voyage, Isabel harvested scallops in an area forbidden under federal law. The National Oceanic and Atmospheric Administration ("NOAA") subsequently imposed a monetary assessment on Isabel and J&J for this unlawful conduct. J&J sought indemnification from Isabel for the portion of the NOAA assessment that it paid and for defense costs it incurred in connection with the NOAA enforcement action. When Isabel refused to indemnify J&J, J&J filed this action for breach of contract.

The parties now cross-move for summary judgment. After

hearing, the Court **ALLOWS** J&J's motion for summary judgment (Dkt. 30) and **DENIES** Isabel's motion for summary judgment (Dkt. 29).

<u>BACKGROUND</u>

When evaluating a summary judgment motion, courts "construe the relevant facts in the light most favorable to the non-moving party." <u>Deaton v. Town of Barrington</u>, 100 F.4th 348, 353 (1st Cir. 2024). The underlying facts in this case are undisputed.

In August 2022, Isabel served as the master aboard the Vessel, which is owned by J&J, on an approximately two-week voyage from New Bedford, Massachusetts, to fish for Atlantic sea scallops. Before embarking on the voyage, Isabel filled out an "Agreement Between Owner and Master" ("the Agreement"), a form contract governing the master's "rights and duties while working as a member of the [Vessel]." Dkt. 1-1 at 1. Isabel, but not J&J, signed on the Agreement's signature page:



<u>Id.</u> at 4. Attached to the Agreement as "Appendix A," however, was a medical questionnaire for the master, <u>id.</u> at 5, which the Agreement expressly required the master to complete. Both Isabel

and J&J's Director of Vessel Operations, Jack Morris, signed at the end of the questionnaire:



Id. at 6. According to Morris, "[i]n [his] experience working with New Bedford scalloping vessels," signing in this manner "is a customary practice used to document mutual agreement on employment terms." Dkt. 36-1 ¶ 6.

The Agreement contains the following indemnification provision:

> Master shall comply with all United States Customs, Coast Guard, Fishing Regulations and all other applicable laws while serving as a Master on board the Vessel. Master warrants that he or she will neither engage in any illegal activities nor use the Vessel for any unlawful purpose during the time that he or she serves as Master. In the event that any actions of the Master subjects [sic] the Vessel or her Owner to any administrative, judicial, or criminal penalty, he or she shall indemnify and hold Owner harmless from such penalty and shall reimburse each of them for such penalties, fines or other expenses or costs.

Dkt. 1-1 ¶ 14. The Agreement states that it "shall be governed exclusively by the general maritime laws of the United States." Id.[1] Finally, the Agreement includes an attorney's fees clause:

---

[1] J&J cites a different choice-of-law provision in the Agreement, which states that "[t]he Crewmember Agreement shall be governed by

> If it shall be necessary for either the Owner or Master to employ an attorney to enforce its rights pursuant to their Agreement because of default of the other party, the defaulting party, as finally determined in any settlement, judgement [sic], or arbitration award related to such default, shall reimburse the non-defaulting party for reasonable attorney's fees and expenses.

Id. ¶ 13.

During two days of the voyage, Isabel harvested scallops in an area forbidden under federal law. The scallops Isabel harvested during the voyage, including those harvested illegally, were subsequently sold for $346,632.42. J&J kept $145,834.80, paid various expenses incurred in connection with the voyage, and then distributed the rest to Isabel (who received $31,139.47) and the other crew members.

On May 4, 2023, NOAA issued a "Notice of Violation and Assessment of Administrative Penalty" to J&J and Isabel. Dkt. 32-1 at 1. NOAA concluded that Isabel had illegally fished for scallops in a closed area and imposed a $74,319.12 "penalty" jointly and severally against J&J and Isabel. Id. at 1-2. NOAA later amended the notice to reduce the penalty to $60,684.58. The four-page notice referred to the amount owed as a "penalty" around twenty times. Dkt. 32-2 at 1-4. The assessment consisted of two

---

the Federal Maritime Law of the United States and failing any such rule by the internal laws of the State of New York." Dkt. 1-1 ¶ 12. Neither party contends that application of New York law instead of federal maritime law would affect the outcome of this case.

components: (1) $15,0000 as a "Base Penalty" and (2) $45,684.58 as "Proceeds of Unlawful Activity." Dkt. 32-3 at 1 (emphasis omitted). This calculation reflected the following formula set forth in NOAA's 2019 "Policy for the Assessment of Civil Administrative Penalties and Permit Sanctions":

> [P]enalties and permit sanctions are based on two criteria: (1) A "base penalty" calculated by adding (a) an initial base penalty amount and permit sanction reflective of the gravity of the violation and the culpability of the violator and (b) adjustments to the initial base penalty and permit sanction upward or downward to reflect the particular circumstances of a specific violation; and (2) an additional amount added to the base penalty to recoup the proceeds of any unlawful activity and any additional economic benefit of noncompliance. Described as an equation:
>
> Base Penalty [(Initial Base Penalty based on the Gravity of the Offense and Culpability) + (Upward/Downward Adjustment for Specific Circumstances)] + [Proceeds of Unlawful Activity and Any Additional Economic Benefit] = [Penalty Assessment and Permit Sanctions]

Dkt. 32-5 at 1, 4.

In March 2024, both Isabel and J&J signed settlement agreements with NOAA to resolve the proceedings. Isabel paid $20,033.33, which his settlement agreement described as the "$15,000 base penalty plus $5,033.33 in proceeds of unlawful activity." Dkt. 29-9 at 1. J&J paid the remaining $40,651.25 of the assessment. J&J sought indemnification from Isabel pursuant to the Agreement for its defense costs and its portion of the NOAA assessment. Isabel refused to indemnify J&J. This breach of contract action ensued.

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine dispute is one which 'a reasonable jury could resolve . . . in the favor of the non-moving party,' and a material issue is one with the 'potential to affect the outcome . . . under the applicable law.'" Kinzer v. Whole Foods Mkt., Inc., 99 F.4th 105, 108 (1st Cir. 2024) (alterations in original) (quoting Cherkaoui v. City of Quincy, 877 F.3d 14, 23-24 (1st Cir. 2017)). In determining whether to grant summary judgment, a court must construe "the facts in the light most favorable to the non-moving party" and "draw[] all reasonable inferences" in her favor. Id. (quoting Harley-Davidson Credit Corp. v. Galvin, 807 F.3d 407, 408 (1st Cir. 2015)).

The party seeking summary judgment "must [first] adumbrate 'an absence of evidence to support the nonmoving party's case.'" Pleasantdale Condos., LLC v. Wakefield, 37 F.4th 728, 733 (1st Cir. 2022) (alteration in original) (quoting Brennan v. Hendrigan, 888 F.2d 189, 191 (1st Cir. 1989)). Once the movant does so, "[t]he burden then shifts to the nonmovant to establish the existence of a genuine issue of material fact." Id. To satisfy this burden, the nonmovant "must present definite, competent evidence" showing that a trialworthy issue exists. Id. (quoting Mesnick v. Gen. Elec.

_Co._, 950 F.2d 816, 822 (1st Cir. 1991)). "[C]onclusory allegations, improbable inferences, and unsupported speculation" do not suffice. _Kinzer_, 99 F.4th at 108 (quoting _Ellis v. Fid. Mgmt. Tr. Co._, 883 F.3d 1, 7 (1st Cir. 2018)).

This standard "do[es] not change where the parties file cross-motions for summary judgment." _Roberge v. Travelers Prop. Cas. Co. of Am._, 112 F.4th 45, 51 (1st Cir. 2024). On cross-motions, the court "review[s] each motion 'separately, drawing facts and inferences in favor of the non-moving party.'" _Id._ (quoting _Scottsdale Ins. Co. v. United Rentals (N. Am.), Inc._, 977 F.3d 69, 72 (1st Cir. 2020)).

## DISCUSSION

The Court begins by briefly addressing the parties' dueling arguments regarding compliance with the local rules and then turns to the merits of J&J's breach of contract claim.

## I.    Compliance with Local Rules

Both parties argue that the opposing side has violated this Court's local rules when briefing the summary judgment motions. Specifically, each party accuses the other of failing to satisfy the meet-and-confer requirement under Local Rule 7.1(a)(2) and filing statements of material facts that do not comply with Local Rule 56.1.

The Court declines to fish through the record to assess the parties' compliance with these rules because, even if a violation

occurred, no sanction would be warranted. A district court has "broad latitude in administering local rules." Melino v. Bos. Med. Ctr., 127 F.4th 391, 397 (1st Cir. 2025) (quoting Air Line Pilots Ass'n v. Precision Valley Aviation, Inc., 26 F.3d 220, 224 (1st Cir. 1994)); see United States v. Roberts, 978 F.2d 17, 20 (1st Cir. 1992) ("A district court possesses great leeway in the application and enforcement of its local rules."). Local Rule 7.1(a)(2)'s meet-and-confer obligation "is designed to ensure that parties present issues to the Court only after they have determined that judicial intervention is necessary." Sensitech, Inc. v. LimeStone FZE, 581 F. Supp. 3d 342, 350 (D. Mass. 2022). Given the parties' briefing, "it does not appear that a conference pursuant to the rule 'would have changed the parties' fundamental positions.'" Id. (quoting Sun Cap. Partners III, LP v. New Eng. Teamsters & Trucking Indus. Pension Fund, 329 F.R.D. 102, 105 (D. Mass. 2018)); see In re Elizabeth & Niki Fishing Corp., 706 F. Supp. 3d 147, 150 (D. Mass. 2023) (declining to sanction a party for a meet-and-confer violation for this reason).

As for Local Rule 56.1, any failure to file compliant statements of material facts does not substantially impede the Court's ability to resolve the summary judgment motions. This rule aims to "prevent[] litigants from shifting the burden of organizing evidence to the district court," Zimmerman v. Puccio, 613 F.3d 60, 63 (1st Cir. 2010), and to "focus[] a district court's attention

on what is -- and what is not -- genuinely controverted," <u>Calvi v. Knox County</u>, 470 F.3d 422, 427 (1st Cir. 2006). The relevant facts in this simple breach of contract action are straightforward and easily discernable from the handful of exhibits submitted by the parties. The parties' filings also make clear that the relevant facts are materially undisputed. The Court therefore excuses any noncompliance with Local Rule 56.1. <u>See</u> <u>Martin v. Tricam Indus., Inc.</u>, 379 F. Supp. 3d 105, 108 n.1 (D. Mass. 2019) (declining to summarily deny a motion for summary judgment despite the movant's failure to file a statement of material facts where the court could "assess the issues . . . based on its review of the record").

## II. <u>Merits</u>

J&J's sole claim against Isabel is for breach of the Agreement's indemnification provision. The Court applies federal maritime law to this claim both in accordance with the choice-of-law provision in the Agreement and because each party treats the Agreement as a maritime contract. <u>See</u> <u>Norfolk S. Ry. v. James N. Kirby, Pty Ltd.</u>, 543 U.S. 14, 22-23 (2004) ("When a contract is a maritime one, and the dispute is not inherently local, federal law controls the contract interpretation."); <u>P.R. Fast Ferries LLC v. SeaTran Marine, LLC</u>, 102 F.4th 538, 545-46 (1st Cir. 2024) (applying federal maritime law to a dispute over a maritime contract). "Federal maritime law includes general principles of contract law." <u>P.R. Fast Ferries</u>, 102 F.4th at 545 (quoting <u>CITGO</u>

_Asphalt Refin. Co. v. Frescati Shipping Co._, 589 U.S. 348, 355
(2020)). To prove a claim for breach of contract under federal
maritime law, "a plaintiff must prove (1) the terms of a maritime
contract; (2) that the contract was breached; and (3) the
reasonable value of the purported damages." _Sweet Pea Marine, Ltd._
_v. APJ Marine, Inc._, 411 F.3d 1242, 1249 (11th Cir. 2005).

In their cross-motions for summary judgment, the parties
dispute three issues related to J&J's breach of contract claim:
whether the Agreement is a binding contract formed between J&J and
Isabel, whether Isabel breached the Agreement by failing to
indemnify J&J in connection with the NOAA proceedings, and whether
the Agreement is enforceable insofar as it requires Isabel to
indemnify J&J in this instance. The Court addresses these three
issues in turn.

### A.    Contract Formation

The first issue concerns whether the Agreement constitutes a
valid contract formed between J&J and Isabel. One requirement for
contract formation "is the mutual assent of the parties to the
essential terms of the agreement." _Enos v. Union Stone, Inc._, 732
F.3d 45, 48 (1st Cir. 2013); _see_ Restatement (Second) of Contracts
§ 17(1) (A.L.I. 1981) ("[T]he formation of a contract requires a
bargain in which there is a manifestation of mutual assent to the
exchange . . . ."). Isabel does not contest that he assented to
the Agreement's terms by signing the Agreement. He argues, however,

that J&J never manifested its assent because Morris, J&J's employee, signed at the end of the appended medical questionnaire rather than on the signature page in the main part of the Agreement. J&J responds that Morris's signature on the questionnaire was a sufficient manifestation of assent to the entire Agreement and, regardless, that the subsequent performance of the Agreement demonstrated its assent.

The Court holds that any reasonable factfinder would conclude on this record that J&J manifested its assent to the terms of the Agreement. "While the usual place for a signature is at the end of the matter or instrument which is to be authenticated or attested, . . . the place of a signature on a writing is not controlling." 80 C.J.S. Signatures § 6 (2025); see 1 Corbin on Contracts § 2.10 (2025) ("A signature may be operative [to express assent] without respect to its position on the document . . . ."). The dispositive question is whether there is "satisfactory evidence that the signature was affixed with intent to authenticate and express assent to the entire document." Corbin on Contracts, supra, § 2.10.

Here, Morris signed at the end of the medical questionnaire appended to, and expressly incorporated into, the Agreement rather than on the signature line of the main part of the Agreement. See One Beacon Ins. Co. v. Crowley Marine Servs., Inc., 648 F.3d 258, 267 (5th Cir. 2011) ("[W]here a contract expressly refers to and

11

incorporates another instrument in specific terms which show a clear intent to incorporate that instrument into the contract, both instruments are to be construed together."). The questionnaire did not lay out any independent contractual terms or require J&J's specific approval. Additionally, it appears based on the dates next to Morris's and Isabel's signatures that Morris signed on J&J's behalf before Isabel even filled out the Agreement and questionnaire. Under such circumstances, Morris's signature on the questionnaire plainly manifested J&J's assent to the entire Agreement and not only to Isabel's responses to the questionnaire.

Even if Morris's signature were insufficient by itself to constitute J&J's assent to the Agreement's terms, J&J also unmistakably demonstrated its assent via its performance. Under general principles of contract law, "[m]anifestation of mutual assent to an exchange requires that each party either make a promise or begin or render a performance." Restatement (Second) of Contracts § 18 (emphasis added); see Princess Cruises, Inc. v. Gen. Elec. Co., 143 F.3d 828, 834 (4th Cir. 1998) (finding manifestation of assent via performance in a maritime case); Marlen C. Robb & Son Boatyard & Marina, Inc. v. Vessel Bristol, 893 F. Supp. 526, 538-39 (E.D.N.C. 1994) (same). Put differently, a party may manifest assent to a contract via "other acts" besides written or spoken words. Restatement (Second) of Contracts § 19(1). J&J was well aware of the terms of the Agreement, which was a form

contract for masters on the Vessel and which Morris signed at the end of the medical questionnaire. Having secured Isabel's assent to those terms, J&J then allowed Isabel to take the Vessel on a scallop-fishing voyage and divided the profits from the voyage amongst itself, Isabel, and the other crew members. J&J's awareness of the terms of the Agreement, its approval of Isabel's use of the Vessel via Morris's signature, and its subsequent performance collectively demonstrated J&J's assent to the Agreement. See One Beacon, 648 F.3d at 269 ("The chief consideration when determining the validity of contractual terms . . . is whether the party to be bound had reasonable notice of the terms at issue and whether the party manifested assent to those terms.").

Isabel's reliance on 46 U.S.C. § 10601 does not move the needle. That statutory provision states that before certain voyages, "the owner, charterer, or managing operator, or a representative thereof . . . of a fishing vessel . . . shall make a fishing agreement in writing with each seaman employed on board" that includes certain terms. 46 U.S.C. § 10601(a)-(b). Even assuming, as Isabel implies, that § 10601's requirement of a written agreement means that oral or implied contracts are not enforceable in this context, the Agreement is a written contract to which the parties manifested mutual assent. Isabel also asserts that § 10601 requires that a vessel's owner sign the contract. Section 10601 contains no such requirement but, regardless, J&J

did sign at the end of the medical questionnaire. Isabel's argument that this signature was not sufficient because the medical questionnaire does not contain the terms required by § 10601(b) is unpersuasive because the questionnaire is appended to, and incorporated into, the Agreement, which Isabel does not dispute contains the required terms.

J&J is therefore entitled to summary judgment on the issue of whether the Agreement constitutes a binding contract between the parties.

### B.  Breach of Indemnification Provision

Having concluded that the parties formed a binding contract as a matter of law, the Court turns to the question of whether Isabel breached the Agreement by failing to indemnify J&J in connection with the NOAA proceedings. The Agreement's indemnification provision states in relevant part as follows:

> In the event that any actions of the Master subjects [sic] the Vessel or her Owner to any administrative, judicial, or criminal penalty, he or she shall indemnify and hold Owner harmless from such penalty and shall reimburse each of them for such penalties, fines or other expenses or costs.

Dkt. 1-1 ¶ 14. Isabel does not contest that his actions "subject[ed]" J&J to the monetary assessment imposed by NOAA and that he did not indemnify J&J in connection with the NOAA proceedings. The parties dispute, however, whether the NOAA assessment constituted a "penalty" that triggered the

14

indemnification provision. J&J argues that it was, stressing that NOAA repeatedly described its assessment as a "penalty" in both its policy document and its notice. Isabel responds that NOAA's assessment consisted of two parts, a "Base Penalty" and "Proceeds of Unlawful Activity," Dkt. 32-3 at 1, and that his settlement agreement with NOAA stated that he was paying the entire "Base Penalty." Thus, in Isabel's view, the portion of the NOAA assessment that J&J paid was solely "Proceeds of Unlawful Activity," which was not a "penalty."

Resolving this dispute requires interpreting the term "penalty" in the Agreement's indemnification provision. Courts interpret maritime contracts "like any other contracts: by their terms and consistent with the intent of the parties." CITGO, 589 U.S. at 355 (quoting Norfolk S. Ry., 543 U.S. at 31). If "the words of a contract in writing are clear and unambiguous, its meaning is to be ascertained in accordance with its plainly expressed intent." P.R. Fast Ferries, 102 F.4th at 546 (quoting CITGO, 589 U.S. at 355). "In such circumstances, the parties' intent can be determined from the face of the agreement and the language that they used to memorialize that agreement." CITGO, 589 U.S. at 355 (cleaned up). The interpretation "of an unambiguous contract is a question of law." N. Ins. Co. of N.Y. v. Point Judith Marina, LLC, 579 F.3d 61, 72 (1st Cir. 2009).

Black's Law Dictionary defines a "penalty" as a "[p]unishment

imposed on a wrongdoer, usu[ally] in the form of imprisonment or fine; esp[ecially], a sum of money exacted as punishment for either a wrong to the state or a civil wrong." Penalty, Black's Law Dictionary (11th ed. 2019). The Supreme Court has similarly construed the term "penalty" to mean "a 'punishment, whether corporal or pecuniary, imposed and enforced by the State, for a crime or offen[s]e against its laws.'" Kokesh v. SEC, 581 U.S. 455, 461 (2017) (alteration in original) (quoting Huntington v. Attrill, 146 U.S. 657, 667 (1892)). Under this definition, a sanction amounts to a penalty if it "redresse[s] . . . a wrong to the public" rather than "a wrong to [an] individual" and if it serves to punish and deter rather than to "compensat[e] a victim for his loss." Id. (quoting Huntington, 146 U.S. at 668).

Under this plain meaning, any reasonable factfinder would conclude that the NOAA assessment J&J paid was a "penalty" that triggered the indemnification provision. NOAA's notice to J&J and Isabel, NOAA's policy document describing the calculation of this type of assessment, and the relevant statutory provision all call the total assessment a "penalty." 16 U.S.C. § 1858(a). NOAA imposed the assessment to redress a wrong to the state, namely a violation of regulations prohibiting scalloping in certain areas. See 50 C.F.R. § 648.14(i)(1)(vi)(A)(1). And the assessment aimed to punish and deter Isabel and J&J from such conduct rather than to compensate a victim. Contrary to Isabel's argument, the fact that

16

part of the assessment reflected the proceeds Isabel and J&J earned from Isabel's unlawful scallop harvesting does not alter the assessment's purpose of redressing a wrong to the state and imposing punishment and deterrence. Indeed, NOAA's policy document explains that the disgorgement of unlawful proceeds serves the deterrent purposes of "prevent[ing] an alleged violator from profiting from his or her unlawful activity, remov[ing] any actual economic benefit to the alleged violator, keep[ing] the alleged violator from gaining an unfair advantage over lawful actors, and "prevent[ing] unlawful activity from continuing as a 'cost of doing business.'" Dkt. 32-5 at 6. The entire NOAA assessment plainly was a "penalty," thus triggering Isabel's duty to indemnify J&J under the Agreement.

Accordingly, there is no genuine dispute that Isabel breached the indemnification provision in the Agreement, and J&J is entitled to summary judgment on the question of breach.

### C.    Enforceability of the Agreement

Finally, Isabel advances a series of arguments asserting that the Agreement's indemnification provision is unenforceable. Isabel's primary argument on this score is that the Court should "exercise its discretion to disgorge an equal amount of [his] indemnification to zero." Dkt. 29 at 14. Isabel contends that "disgorgement" is appropriate here because J&J has no rightful claim to retain the proceeds of unlawful conduct, which would be

17

the effect of requiring Isabel to indemnify J&J. Disgorgement, however, is a type of remedy for unlawful conduct, see, e.g., Liu v. SEC, 591 U.S. 71, 75-76 & 76 n.1 (2020); In re Fin. Oversight & Mgmt. Bd. for P.R., 121 F.4th 280, 315 (1st Cir. 2024); Amador v. United States, 98 F.4th 28, 35 (1st Cir. 2024), and Isabel has asserted no counterclaims against J&J. Isabel does not cite any authority supporting his use of the concept of disgorgement as a basis to render a contract unenforceable or otherwise as a defense to a breach of contract claim.[2]

Isabel also raises a series of perfunctory arguments that the indemnification provision is unenforceable because it is unconscionable and against public policy and would allow J&J to be unjustly enriched. These arguments are inadequately developed and, thus, waived. See Groveland Mun. Light Dep't v. Phila. Indem. Ins. Co., 496 F. Supp. 3d 582, 586 (D. Mass. 2020) (noting that courts do "not consider any argument raised in only a perfunctory manner"); Modeski v. Summit Retail Sols., Inc., 470 F. Supp. 3d 93, 110 (D. Mass. 2020) (similar). In any event, there is nothing unconscionable, inequitable, or contrary to public policy about

---

[2] All of the cases Isabel cites involved enforcement actions brought by a government agency seeking disgorgement for violations of federal law. See, e.g., SEC v. Sanchez-Diaz, 88 F.4th 81, 85-86 (1st Cir. 2023); SEC v. Sharp, 737 F. Supp. 3d 66, 71-72 (D. Mass. 2024), appeal filed sub nom. SEC v. Sexton, No. 24-1772 (1st Cir. Aug. 26, 2024); Crude Co. v. FERC, 923 F. Supp. 222, 229 (D.D.C. 1996), aff'd, 135 F.3d 1445 (Fed. Cir. 1998).

enforcing the indemnification provision in this case. J&J and Isabel exchanged the use of the Vessel for a share of the profits from the scallops Isabel harvested on the voyage. J&J lost the profits to which it was entitled for a portion of the voyage because Isabel scalloped in a closed area. The indemnification provision represents a reasonable agreement that Isabel, who was responsible for the unlawful conduct, would reimburse J&J for this loss.

### D.    Summary, Damages, and Remaining Matters

In sum, any reasonable factfinder would rule in J&J's favor on its claim that Isabel breached the indemnification provision in the Agreement. The Court therefore grants summary judgment to J&J and denies Isabel's motion for summary judgment.[3]

With regard to damages, a party prevailing on a breach of contract claim is generally entitled to expectation damages that include "the loss in the value to [it] of the other party's performance." Restatement (Second) of Contracts § 347(a). There is no question that Isabel's duty to indemnify J&J under the Agreement required Isabel to reimburse J&J for the portion of the NOAA assessment that J&J paid. See Dkt. 1-1 ¶ 14 ("In the event that any actions of the Master subjects [sic] the Vessel or her Owner

---

[3] Isabel's motion for summary judgment seeks sanctions and attorneys' fees against J&J. Neither is warranted because the Court grants summary judgment to J&J.

to any administrative, judicial, or criminal penalty, he or she shall indemnify and hold Owner harmless from such penalty and shall reimburse each of them for such penalties, fines or other expenses or costs."). J&J is therefore entitled to damages in the amount of $40,651.25.

Under federal maritime law, courts generally award prejudgment interest to a plaintiff who recovers damages, unless "'exceptional circumstances' make an award of interest inequitable." Nevor v. Moneypenny Holdings, LLC, 842 F.3d 113, 124 (1st Cir. 2016) (quoting City of Milwaukee v. Cement Div., Nat'l Gypsum Co., 515 U.S. 189, 195 (1995)). An award of prejudgment interest is warranted in this case "to ensure that [J&J] is fully compensated for its loss." Id. (quoting City of Milwaukee, 515 U.S. at 195). "[T]he rate of prejudgment interest awarded is a matter committed to the discretion of the court." Cape Waterman, Inc. v. M/V AVA PEARL, 542 F. Supp. 3d 106, 117 (D. Mass. 2021). The Court awards prejudgment interest from April 12, 2024 -- the date J&J paid its portion of the NOAA assessment, which followed Isabel's statement to J&J that he would not provide indemnification -- at the federal statutory rate. See 28 U.S.C. § 1961(a); see also FSS, Inc. v. W-Class Yacht Co., No. 16-cv-300, 2018 WL 953337, at *14 (D. Me. Feb. 20, 2018) (awarding prejudgment interest in admiralty case at federal statutory rate for postjudgment interest).

Finally, J&J asserts that Isabel must reimburse it under the Agreement for the attorneys' fees and costs it incurred in connection with both the NOAA enforcement action and this lawsuit. The Court will address J&J's request for fees and costs on a post-judgment motion under Federal Rule of Civil Procedure 54(d).

### ORDER

For the foregoing reasons, J&J's motion for summary judgment (Dkt. 30) is **ALLOWED**, and Isabel's motion for summary judgment (Dkt. 29) is **DENIED**. The parties shall submit a proposed form of judgment within fourteen days of the date of this order.

SO ORDERED.

/s/ PATTI B. SARIS
Hon. Patti B. Saris
United States District Judge